IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; COTTONWOOD ENVIRONMENTAL LAW CENTER,<br><br>                    Plaintiffs,<br>v.<br><br>S.M.R. JEWELL, in her official capacity as Secretary of the Interior; NATIONAL PARK SERVICE,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER AFFIRMING THE NATIONAL PARK SERVICE'S FINAL AGENCY ACTION**<br><br>Case No. 2:14-cv-00731-JNP-BCW<br><br>District Judge Jill N. Parrish |

Plaintiffs Western Watersheds Project and Cottonwood Environmental Law Center (collectively "Environmental Plaintiffs") bring this suit challenging the actions of the National Park Service (the "Park Service") in issuing an October 2014 three-year Special Use Permit (the "Permit") authorizing cattle grazing on the Hartnet Allotment in Capitol Reef National Park ("Capitol Reef"). Environmental Plaintiffs allege that the Park Service failed to comply with the National Environmental Protection Act ("NEPA") and therefore violated the Administrative Procedures Act ("APA"). Specifically, Environmental Plaintiffs contend that the Park Service's decision to categorically exclude the Permit for the Hartnet Allotment from NEPA analysis was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Environmental Plaintiffs appeal the agency action, asking this court to hold that the Park Service violated NEPA and requesting the court vacate the categorical exclusion and the Permit. For the reasons set forth below, the court AFFIRMS the Park Service's action.

## FACTUAL BACKGROUND

Capitol Reef National Park, located in south-central Utah, was established by Congress on December 18, 1971. At that time, there were 19 cattle grazing allotments within Capitol Reef. The enabling legislation provided for a 10-year phase-out of cattle grazing in the park. But local concern about the economic impact of phasing out cattle grazing in Capitol Reef led Congress to pass legislation in 1982, extending grazing in the park through December 31, 1994. The 1982 legislation also called for the Park Service to contract with the National Academy of Sciences to study the impact of grazing on Capitol Reef's resources. In 1988, Congress passed another piece of legislation that extended cattle grazing privileges to allow permittees who legally used Capitol Reef lands for livestock grazing when the park was established to continue the practice during their lifetime and the lifetime of their children who were born on or before establishment of Capitol Reef. This 1988 law is still in effect today.

The Park Service bought out seventeen of the grazing permits over the past few decades and now only two grazing allotments remain in Capitol Reef. Among the two remaining allotments is the Hartnet Allotment. The Hartnet Allotment is comprised of 96,000 acres—about 71,000 of which are in the park. It has been managed by the Park Service since 2010. The grazing season on the Hartnet Allotment runs from October 15 through May 31 each year for up to 163 cow/calf pairs. The Park Service authorizes grazing on the Hartnet Allotment by issuing Special Use Permits.

Three protected plant species found in the Hartnet Allotment are listed as threatened or imperiled under the Endangered Species Act: the Wright Fishhook cactus (Sclerocactus wrightiae), the Winkler cactus (Pediocactus winkleri), and the Last Chance Townsendia

(Townsendia aprica). The Hartnet Allotment area contains "very important habitat for the maintenance of" each of these three species.

On October 15, 2014, the Park Service issued a three-year Permit for grazing on the Hartnet Allotment. The three-year permit was considered an "interim permit" because the Park Service is proceeding with an Environmental Impact Statement ("EIS")/Management Plan for long-term management of livestock grazing and trailing in Capitol Reef. The EIS/Management Plan is scheduled for completion in 2017. When the Park Service issued the three-year Permit, it categorically excluded the Permit from NEPA analysis. In December 2014, the Park Service prepared a Biological Assessment pursuant to the Endangered Species Act that analyzed the impacts of cattle grazing on the three protected plant species through 2017. The U.S. Fish and Wildlife Service also subsequently completed a Biological Opinion ("BiOp") similarly analyzing the impacts of cattle grazing on the three protected plant species.

Environmental Plaintiffs first filed their complaint against the Park Service on April 29, 2014 alleging that the Park Service had violated NEPA and the Endangered Species Act by failing to analyze the environmental impacts of cattle grazing in Capitol Reef. After the Park Service issued the Permit in October 2014 and prepared a Biological Assessment pursuant to the Endangered Species Act that analyzed the impacts of cattle grazing on the three plant species through 2017, the parties agreed that the Environmental Plaintiffs' claims under the Endangered Species Act were moot. Environmental Plainiffs amended their complaint on April 30, 2015, challenging only the Park Service's decision to categorically exclude from NEPA analysis the three-year Permit for grazing on the Hartnet Allotment. On March 16, 2015, the Park Service published a notice in the Federal Register announcing its intentions to complete the long-term

EIS/Management Plan. Thus, the only issue before the court is whether the Park Service violated NEPA by categorically excluding the Permit for the Hartnet Allotment from environmental analysis while the long-term EIS/Management Plan is prepared.

## LEGAL STANDARDS

Although docketed as a Motion for Summary Judgment, this is a review of final agency action and will be analyzed under the appropriate standard of review for agency action—not under Fed. R. Civ. P. 56. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994) ("A district court is not exclusively a trial court. In addition to its nisi prius functions, it must sometimes act as an appellate court. Reviews of agency action in the district courts must be processed as appeals. . . . Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal.").

The APA allows for judicial review of final agency action. 5 U.S.C. §§ 702, 704. The APA further outlines the scope of judicial review and states that "[t]he reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). The duty of a court in reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). "[I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise," then the agency action would be arbitrary and capricious and held to be unlawful. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43. In engaging in its review, the court must be thorough, but keep in mind the standard of review is narrow and highly deferential with the agency's decision being "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). The court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416.

NEPA "mandates that federal agencies . . . assess potential environmental consequences of a proposed action." *Utah Envt'l Cong. v. Russell*, 518 F.3d 817, 820–21 (10th Cir. 2008) (citations omitted). Although NEPA "dictates the process by which federal agencies must examine environmental impacts," it does not substantively limit agency conduct. *Id.* at 821 (citations omitted). A federal agency can comply with the NEPA process for a proposed action in one of three ways: (1) prepare an environmental impact statement, (2) prepare an environmental assessment, or (3) prepare a categorical exclusion. *Id.* A "categorical exclusion" is available only for "those actions predetermined not to 'individually or cumulatively have a significant effect on the human environment.' [40 C.F.R.] § 1508.4." *Id.* In *Guidance Regarding NEPA Regulations*, 48 Fed.Reg. 34,263, 34,265 (July 28, 1983), the Council on Environmental Quality ("CEQ") expressed concern that federal agencies were applying categorical exclusions too narrowly and discouraged the practice, stating that "if this approach is applied narrowly it will not provide the agency with sufficient flexibility to make decisions on a project-by-project basis with full consideration to the issues and impacts that are unique to a specific project." *Id.* The CEQ went on to encourage agencies "to consider broadly defined criteria which characterize types of

5

actions that, based on the agency's experience, do not cause significant environmental effects." *Id. See also Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1209–10 (10th Cir. 2006) (citing the *Guidance Regarding NEPA Regulations*).

Before implementing an action under a categorical exclusion, an agency must determine that there are no "*extraordinary circumstances* in which [the] normally excluded action may have a significant environmental effect." 43 C.F.R. § 46.205(c) (emphasis added). *See also California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). If "extraordinary circumstances" are present, further analysis and environmental documents must be prepared and the use of a categorical exclusion is inappropriate. 43 C.F.R. § 46.205(c)(1). Park Service regulations provide that "[e]xtraordinary circumstances (see paragraph 46.205(c)) exist for individual actions within categorical exclusions that may . . . [h]ave significant impacts on species listed" under the Endangered Species Act. 43 C.F.R. § 46.215(h). The General Management Plan for Capitol Reef National Park states that "[a]ny impact that may affect listed or National Park Service sensitive species would be considered significant." Nat'l Park Serv., *Final Environment Impact Statement General Management Plan Development Concept Plan*, 108, *available at* http://www.nps.gov/care/learn/management/upload/caregmp.pdf.

## ANALYSIS

Environmental Plaintiffs first argue that the Park Service's conclusion that extraordinary circumstances do not exist because cattle grazing would not have a significant impact on the three plant species is contrary to the evidence that was before the agency. To support its argument, Environmental Plaintiffs focus on two conclusions on which the Park Service based its decision to categorically exclude the Permit from NEPA analysis: (1) that the "short-term"

6

duration of the permit would limit the impact of grazing on the three plant species; and (2) that mitigation measures would limit the impact of grazing on the three plant species.

When the Park Service issued the Permit under a categorical exclusion, it stated that while "individual plants may be effected [sic] by trampling[,] plant populations would still occur in the park and significant impacts would not be expected given the short-term nature (no more than 3 seasons) of this permit renewal." The Biological Assessment echoed that conclusion stating that "[d]espite the fact that livestock grazing has occurred on lands in the Hartnet Allotment for well over 80 years with impacts on individual Winkler cacti, their populations are persisting in the park and are expected to be maintained during the three years that the Permits are issued while the park's grazing EIS/[M]anagement [P]lan is being completed." The Biological Assessment went on to find that given the short-term nature of the Permit in question, there would not be substantial impacts to the three plant species. But Environmental Plaintiffs point out that the Biological Assessment also stated that livestock grazing effects "can be short-term or long-term" and argue that this internal inconsistency renders the ultimate decision to categorically exclude and issue the Permit arbitrary and capricious. The court disagrees.

Although the Biological Assessment stated that the effects from livestock grazing could be short-term or long-term, the Park Service's offered explanation does not run counter to the evidence before the agency. The Biological Assessment indicated that the evidence supported the Park Service's conclusion that although cattle grazing may possibly have a negative effect on the three plant species in the long term, the impact over the three years of the Permit was not substantial. Indeed, the Biological Assessment states that the evidence before the Park Service indicates that populations of the three plant species would persist and be maintained during the

7

three years of the Permit while the long-term EIS/Management Plan is being completed. Thus, the Biological Assessment's statement that livestock grazing effects could be felt in both the short and long term is not inconsistent with categorically excluding the short-term Permit. The Park Service found there would not be a substantial impact to the three plant species in the short term and the long-term effects are being studied in connection with the forthcoming EIS/Management Plan. The possibility of substantial impact in the long term does not render the Park Service's conclusion that there would be no substantial impact in the short term arbitrary and capricious.

Environmental Plaintiffs next attack the Park Service's reliance on mitigation measures as a factor in determining that the Permit qualified for a categorical exclusion. The categorical exclusion for the Permit explains that mitigation measures imposed in the Permit will further reduce the levels of impacts to insignificant. Specific mitigation measures include:

> 1. Monitor[ing] range conditions before and during the time cattle are present on the allotment to evaluate the extent of harm, if any to the listed species. If harm is observed, work with the permit holders to reallocate cattle within the allotment.
> 2. Voluntarily reduc[ing] the overall [animal unit months] if weather and precipitation conditions suggest that the range cannot support the fully permitted number of cattle.
> 3. Voluntarily reduc[ing] the overall [animal unit months] by working with the permit holders to remove a portion of the cattle from the allotment on or before May 1.

Based on these measures and its consideration of the short-term nature of the Permit, the Park Service concluded that the impacts on the listed species would not be significant.

Environmental Plaintiffs cite to *Northern Plains Resource Council v. Surface Transportation Board*, in which the Ninth Circuit held that "mitigation measures . . . are not alone sufficient to meet the [agency's] NEPA obligations to determine the projected extent of the

environmental harm to enumerated resources *before* a project is approved." 668 F.3d 1067, 1084 (9th Cir. 2011) (emphasis in original). The Ninth Circuit warned that "[t]he use of mitigation measures as a proxy for baseline data does not further" the purposes of NEPA. *Id.* at 1085. But the mitigation measures in this case were not considered alone, nor were they used as a proxy for baseline data. Rather, the mitigation measures were an additional factor that strengthened the conclusion the Park Service had already drawn from the evidence and its experience that there would not be a significant effect on the three plant species over the three-year term of the Permit.

Environmental Plaintiffs also argue that the Park Service went beyond its own NEPA policy contained in its handbook that states: "Only minimal mitigation should be part of an action categorically excluded, and the effectiveness and enforcement of the mitigation must carry a high degree of certainty." The handbook further states:

> If . . . mitigation is required to avoid the potential for environmental impact, you should consider an [environmental assessment] or [environmental impact statement]. Only minimal mitigation should be part of an action categorically excluded, and the effectiveness and enforcement of the mitigation must carry a high degree of certainty.

But nothing in the record before the court indicates that the Park Service went beyond what its NEPA handbook allows in considering mitigation measures. The Park Service concluded that the short-term nature of the Permit supported its finding that there would not be a substantial effect on the three plant species. The mitigation measures were considered only insofar as they would *further* reduce any impact. The Park Service did not conclude that mitigation was *required* to avoid the potential for environmental impact. Nor did the evidence before the Park Service indicate that mitigation measures would be *required* to render the effect on the three plant species insignificant. The categorical exclusion documented and explained that the outlined

mitigation measures would *also* reduce the levels of impacts to insignificant. Indeed, the mitigation measures in the Permit can best be described as minimal and would therefore be consistent with the Park Service's NEPA policy handbook. The conclusion that extraordinary circumstances did not exist because of the short-term nature of the Permit and the included mitigation measures was supported by the evidence before the Park Service and was not arbitrary and capricious.

Environmental Plaintiffs next argue that the Park Service's conclusion that there were no extraordinary circumstances was arbitrary and capricious because the Park Service was required to determine whether grazing may "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks." 43 C.F.R. § 46.215(d). Environmental Plaintiffs argue that because the Biological Assessment stated that the issuance of the Permit "may affect, is likely to adversely affect" each of the three plant species, the Park Service's conclusion that cattle grazing does not involve highly uncertain and potentially significant environmental effects was contrary to the evidence before the agency. But Environmental Plaintiffs fail to consider other evidence before the Park Service that supports its conclusion. First, the Biological Assessment also concluded that the Park Service expected the cacti populations would still occur in the Park and substantial impacts would not occur given the short-term nature of the Permit. Second, the mitigation measures described in the Biological Assessment would further reduce any possible impact on the plants. The Park Service has experience with grazing on the Hartnet Allotment for over 80 years and has performed extensive surveys documenting the status of the three plant species over that time. This additional experience is evidence that the Park Service was not encountering any "highly uncertain" effects,

10

nor was it dealing with "unique or unknown environmental risks." In short, the Park Service's conclusion that issuing the Permit did not pose "highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks" was not contrary to the evidence before it and was therefore neither arbitrary nor capricious. The Council on Environmental Quality, as part of its oversight of implementation of NEPA, has encouraged federal "agencies to consider broadly defined criteria which characterize types of actions that, based on the agency's experience, do not cause significant environmental effects." *Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263 (July 28, 1983). The Park Service relied not only on the evidence mentioned above, but also on its experience in arriving at its conclusion to categorically exclude the Permit.

Environmental Plaintiffs also argue that the Park Service's conclusion that extraordinary circumstances do not exist was arbitrary and capricious because its conclusion that grazing would not contribute to the spread of noxious weeds contradicted the evidence before it. 43 C.F.R. § 46.215(l). Environmental Plaintiffs look to the Environmental Screening Form that asks whether grazing would contribute to the spread of noxious weeds. Although the Park Service checked the "no" box in response to that question, the notes to the side of the check box, as well as the Biological Assessment and categorical exclusion, acknowledge that one effect of cattle grazing "may" include "the spread of non-native plant species" and "facilitat[ion of] the introduction of non-native species." But Environmental Plaintiffs ignore the portion of the record indicating the presence of non-native plant species in portions of the Hartnet Allotment as well as in other areas of the Park that are not grazed by cattle. The Park Service acknowledges that cattle grazing may promote the continued existence or spread of non-native plant species, but

maintains that the effects of grazing were expected to be negligible or minor as a result of the short-term nature of the Permit. Given the evidence before the Park Service, the court does not find that its conclusion regarding the spread of noxious weeds was contrary to the evidence and the decision to categorically exclude the Permit was therefore not arbitrary and capricious on these grounds.

Finally, Environmental Plaintiffs argue that the Park Service's decision to categorically exclude the Permit violates NEPA because grazing has "the potential for measurable environmental impact." The categorical exclusion form states that no conditions contained within Section 3-6 of the NEPA handbook apply. But Environmental Plaintiffs contend that Section 3-6 of the NEPA handbook requires an environmental assessment or environmental impact statement "[i]f an action . . . has the potential for measurable environmental impact." That section of the handbook also requires an environmental assessment or environmental impact statement "[i]f a local, state, or federal agency with jurisdiction by law over an affected resource believes the potential for measurable environmental impact exists for an action that a park initially intends to categorically exclude from further analysis." Environmental Plaintiffs rely on language in the Biological Assessment indicating that cattle grazing is expected to have adverse impacts on the Winkler cactus. Specifically, the Biological Assessment determined that of the 58 known locations of the Winkler Pincushion cactus in Capitol Reef, 36% are at "high risk" from cattle disturbance. Environmental Plaintiffs maintain that this finding in the Biological Assessment mandated the conclusion that cattle grazing has the potential for measurable environmental impacts on the three plant species. Environmental Plaintiffs also argue that the record does not

indicate that the Park Service consulted with the U.S. Fish and Wildlife Service as required by the NEPA handbook.

The Park Service responds that despite the findings in the Biological Assessment that there is *some* potential environmental impact, that impact is not measurable. The Park Service points to the Biological Assessment conclusion that "some unquantified loss" of cacti and associated habitat is anticipated. The parties dispute whether there is a difference between the action having no "measurable" impact as opposed to an "unquantified" impact. If the court were to adopt the Environmental Plaintiffs' interpretation of the handbook—i.e., that any impact that is potentially measurable would require further environmental analysis—it is hard to imagine any action the Park Service could take without preparing an environmental assessment or environmental impact statement. Such a result is contrary to the CEQ's guidance with regard to NEPA. *See Guidance Regarding NEPA Regulations*, (stating that the guidance to "consider broadly defined criteria" in employing categorical exclusions was made in response to "[c]oncerns . . . expressed that agencies were requiring too much documentation for projects that were not major federal actions with significant effects"). With the CEQ's guidance in mind, the court interprets the handbook requirement to be another way of saying that if the impact may be substantial, further environmental analysis is required. As explained above, the Park Service's conclusion that any impact to the three plant species would not be substantial or significant was supported by the evidence before it. Furthermore, the Park Service has documented that there was ongoing informal consultation with the U.S. Fish and Wildlife Service as provided by both the Endangered Species Act and its handbook, and a final BiOp was issued by the Fish and Wildlife Service on August 31, 2015. Because the Park Service did in fact conver with U.S. Fish

13

and Wildlife Service and reasonably concluded that any impact was immeasurable, its conclusion that Section 3-6 of its NEPA handbook did not apply was neither arbitrary nor capricious.

## CONCLUSION

The procedures followed by the Park Service in making its decision to categorically exclude the Permit for cattle grazing on the Hartnet Allotment were in line with NEPA requirements and its conclusion was not arbitrary and capricious. For the reasons fully outlined above, the court AFFIRMS the National Park Service's decision to categorically exclude the three-year Permit from further NEPA analysis.

Signed November 23, 2016.

BY THE COURT

Jill N. Parrish
United States District Court Judge